UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ESTATE OF SAULO DEL ROSARIO, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> PATERSON POLICE DEPARTMENT., *et al.*, <br><br> Defendants. | 14-cv-5167 <br><br> OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter arises out of the officer-involved death of Saulo Del Rosario in September 2012. The matter comes before the Court on three motions for summary judgment filed by (1) Defendants City of Paterson and the Paterson Police Department ("Paterson" or "Municipal Defendants"), ECF No. 127 ("Paterson Motion"); (2) Paterson Police Officer Marj Kush, ECF No. 128 ("Kush Motion"); and (3) Sergeant Troy Bailey (with Paterson and Kush, "Defendants"), ECF No. 130 ("Bailey Motion"). For the reasons set forth below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

I. BACKGROUND

The tragic events leading to Saulo Del Rosario's death are relatively undisputed by the parties. Saulo had a history of seizures and mental disturbances, including hallucinations. Statement of Material Facts ¶¶ 7-14, 16-17, ECF No. 127-1 (hereinafter, "SoF").[1] On the evening of August 31, 2012, Saulo locked himself in his bedroom without taking his seizure medication. *Id.* ¶¶ 19-21. Concerned, on the morning of September 1, two of Saulo's children, Plaintiffs Steven and Honey Del Rosario, asked an English-speaking friend, Kelvin Lopez, to call 911. *Id.* ¶ 30. Lopez called 911 and asked for help removing Saulo, describing him as epileptic and having "mental problems." *Id.* ¶ 31.

At approximately 9:15 AM, Defendant Officers Anthony Petrazzuolo and Angel Sandoval were dispatched to Saulo's house "on a call of a barricaded Emotionally Disturbed Person" ("EDP"). *Id.* ¶ 32. Upon arrival, Steven and Honey described Saulo's medical condition to the responding officers. *Id.* ¶ 33. Further, Lopez told them Saulo's family wanted help opening the door so they could take him to a doctor. *Id.* ¶ 34. Officer Sandoval heard glass breaking from inside the bedroom. *Id.* ¶ 35. Saulo's sister, Marta Del Rosario, said she was not aware whether Saulo had any weapons. *Id.* ¶ 37. The responding officers attempted to speak with Saulo in English and Spanish but received no

---

[1] Citations to the SoF refer to agreed-to facts unless otherwise noted.

1

response. *Id.* ¶¶ 38-39. Next, Officer Sandoval heard running, a loud bang, and a "thud" coming from the bedroom. *Id.* ¶ 40.

Officer Petrazzuolo contacted Sergeant Troy Bailey, notifying him that an EDP was not responding to attempts to communicate. *Id.* ¶ 41. Sergeant Bailey requested backup from the Police Department's Emergency Response Team ("ERT"). *Id.* ¶ 43. ERT-Member Defendants Marj Kush and Robert Challice responded. Defendant Officer Giuseppe Ciarla also arrived and, with Officer Sandoval, tried to view Saulo through an alleyway window.[2] *Id.* ¶¶ 44-46. They were initially unsuccessful, and Officer Sandoval returned to the residence while Officer Ciarla remained outside. *Id.*

Sergeant Bailey made the decision to breach the bedroom, though the parties disagree on why. *Id.* ¶¶ 50-51, Opp. to SoF ¶ 50-51, ECF No. 135-1. Officer Challice kicked in the door and Officer Kush entered first, holding his service weapon on top of a "Baker Batshield"—an anti-ballistic shield. SoF ¶¶ 57-58. After the breach, Saulo discarded a large mirror he was hiding behind and jumped on top of a bed. *Id.* ¶ 59. Defendants claim Saulo "was screaming and holding a claw hammer in his right hand which he began swinging aggressively." *Id.* ¶ 60. Plaintiffs disagree, arguing the hammer was at Saulo's side or that he dropped it. Opp. to SoF ¶¶ 60, 63. The parties agree, however, that Officer Ciarla told the breaching team that Saulo had a hammer and that the breaching officers told Saulo to drop it several times, albeit in English. SoF ¶¶ 61-62.

Shortly after they entered the bedroom, Saulo charged the officers. *Id.* ¶ 63; Opp. to SoF ¶ 63 (failing to adequately dispute charging portion of allegation, only position of hammer). "Officer Kush, believing his life was in danger, fired two shots, striking [Saulo] once in the head when [he] was approximately three feet from [Kush]." SoF ¶ 64. EMTs on the scene responded but were unable to save Saulo's life. SoF ¶ 65.

## II. PROCEDURAL HISTORY

On November 27, 2012, Carmen Gonzalez, Yunior Reyes Gonzales, Honey Del Rosario, Leidy Del Rosario, Steven (aka Styven) Javier Del Rosario, Elvio Del Rosario, Yaniris Del Rosario, Diosmendy Del Rosario, Martha (aka Marta) Del Rosario, Carmenlina Del Rosario, Emely Del Rosario, Miguel Del Rosario, and Misael Del Rosario (without Carmenlina, "Individual Plaintiffs" and with Saulo's Estate, "Plaintiffs") filed thirteen separate Tort Claims Act ("TCA") notices, listing themselves as the "Claimant." SoF ¶¶ 114-15; Murphy Ex. 41, ECF No. 127-29. On August 19, 2014, Plaintiffs filed a twelve-count complaint under 42 U.S.C. § 1983 and various state laws. ECF No. 1. On April 16, 2014, the Court dismissed Section 1983 claims against the Municipal Defendants (Count One) without prejudice and intentional infliction of emotional distress claims against the Municipal Defendants (Count Eight) with prejudice. ECF Nos. 30-31. The Court further ordered Plaintiffs to submit a more complete statement of their conspiracy count (Count Three). *Id.* On June 16, 2015, Plaintiffs filed their Amended Complaint

---

[2] Though named as Defendants, Officers Petrazzoulo, Sandoval, Challice, and Ciarla (together with Kush and Bailey, "Individual Defendants") did not move for Summary Judgment.

2

alleging the same twelve counts.³ On November 3, 2016, the Court dismissed, with prejudice, (1) the survivorship and derivative claims of all individual plaintiffs except Javier Del Rosario, Leidy Del Rosario, and Honey Del Rosario⁴ and (2) Gonzalez and Yunior Reyes's individual claims. ECF Nos. 77-78. The following claims remain:

- **Counts 1, 2, 5**: Section 1983 claims by the Estate, Javier, Leidy, and Honey.
- **Count 4**: Negligence.
- **Count 6**: Wrongful death by the Estate.
- **Count 7**: Survivorship by the Estate.
- **Count 8**: Intentional infliction of emotional distress against the Individual Defendants.
- **Count 9**: Negligent infliction of emotional distress.
- **Counts 10, 11, 12**: Tortious conduct of employee (10), negligent hiring and training (11), and negligent supervision (12) against the Municipal Defendants.

### III. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FRCP 56. A fact is material if its determination might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* To make this determination, the Court views the facts in the light most favorable to the nonmovant and all reasonable inferences must be drawn in the nonmovant's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The moving party bears the burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. If the moving party carries its initial burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (citation omitted). "The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on

---

[3] Plaintiffs failed to submit a more complete statement of the conspiracy claim (Count Three), and thus the claim is **DISMISSED**. *Compare* Amend. Compl. ¶¶ 73-76, ECF No. 35 (conspiracy count allegations), *with* Compl. ¶¶ 47-50 (identical allegations). Defendants did not re-move to dismiss the updated Section 1983 claims against the Municipal Defendants.

[4] Thus, except for Plaintiffs Javier, Leidy, and Honey, and the Estate itself, Counts One, Two, and Five (Section 1983), Six (wrongful death), and Seven (survivorship) have been dismissed. Defendants now move for summary judgment on Javier, Leidy, and Honey's wrongful death and survivorship claims. Paterson Mot. at 27-29. Plaintiffs fail to oppose that portion of the motion. Accordingly, and for the reasons in Paterson's brief, summary judgment is **GRANTED** on Javier, Leidy, and Honey's survivorship and wrongful death claims (Counts Six and Seven).

3

which a jury could decide an issue of fact its way." *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007) (citation omitted). "A party moving for summary judgment on an issue for which it bears the ultimate burden of proof faces a more difficult road . . . . In such a case, if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, summary judgment is inappropriate." *Donovan*, 661 F.3d at 185.

IV. **DISCUSSION**

### A. <u>Section 1983 Claims (Counts One, Two, Five)</u>

Defendants argue they are entitled to summary judgment on the Section 1983 claims because, *inter alia*, (1) Officer Kush and Sergeant Bailey are entitled to qualified immunity and (2) the Municipal Defendants cannot be liable without an underlying civil rights violation. Courts apply a two-part test in determining issues of qualified immunity: (1) "whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009) (citations omitted). While questions of qualified immunity are appropriately answered as a matter of law, issues of fact may preclude ruling at the summary judgment stage. *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009).

Defendants focus on the first part of the qualified immunity test, arguing: (1) they entered the residence by consent and entered the bedroom as part of a continuous search; (2) exigent circumstances justified Sergeant Bailey's decision to enter the bedroom; and (3) Officer Kush's use of force was justified by the circumstances.

#### 1. *Entry into Residence and Continuous Search*

Defendants entered the residence by consent. SoF ¶ 34. Therefore, the initial entry was permissible. Relying on *City & County of San Francisco v. Sheehan*, 135 S.Ct. 1765 (2015), Sergeant Bailey argues entry into the bedroom was part of the same consented-to "continuous search." Bailey Br. at 8. However, *Sheehan* involved two "exigent circumstances" entries that were part of one continuous search. *Sheehan*, 135 S.Ct. at *1775. The problem here is that further consent (or some other justification) was required to enter the bedroom due to Saulo's obvious resistance to the officers' entry. *See Georgia v. Randolph*, 547 U.S. 103, 120 (2006) (holding that search of shared dwelling over express refusal by present resident cannot be justified by another resident's consent). Accordingly, entry into the bedroom must be otherwise justified.

#### 2. *Exigent Circumstances for Decision to Enter Bedroom*

The Fourth Amendment protects against unreasonable searches and seizures. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (cleaned up). "The officer's subjective motivation is irrelevant." *Id.* However, courts only consider the facts and circumstances known to the acting officer at the time. *Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010) (citation omitted).

4

Pursuant to the Fourth Amendment, a warrantless search is presumptively unreasonable. *Stuart*, 547 U.S. at 403. To be lawful, warrantless searches must "fall[] within one of the narrow and well-delineated exceptions." *Flippo v. W. Virginia*, 528 U.S. 11, 13 (1999). The "exigency" or "emergency aid" exceptions apply when the police "reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."). "The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is 'heavy.'" *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014).

In the context of civil commitment, the fundamental "reasonableness" inquiry is the same. *Catlett v. New Jersey State Police*, No. 12-cv-153, 2015 WL 9272877, at *4 (D.N.J. Dec. 18, 2015). "When there is probable cause to believe that a person is a danger to himself or others," an officer need-not obtain a warrant before attempting to "detain a person for a psychiatric evaluation." *Id.* (citing *Must v. West Hills Police Dep't*, 126 Fed. App'x 539, 542-43 (3d Cir. 2005)). "[A] showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Id.* (quoting *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)); *see also Meyer v. Bd. of Cty. Comm'rs of Harper Cty., Okla.*, 482 F.3d 1232, 1240 (10th Cir. 2007) (requiring articulatable, specific facts leading an officer to believe the person is a threat to herself or others).

Here, the undisputed facts establish Sergeant Bailey decision to enter the bedroom was objectively reasonable due to exigent circumstances. The parties agree that when Officer Petrazzuolo contacted Sergeant Bailey, he told Bailey that Saulo was an EDP and not responding. SoF ¶ 41. Further, Bailey's uncontroverted testimony establishes that when he entered the house, he witnessed the other officers' failed attempts to communicate with Saulo. Bailey Dep. at 97:9-12, ECF No. 127-13. Next, Bailey learned that after Officer Sandoval had arrived at the scene, Saulo had broken some glass and shrieked or yelled inside the room. *Id.* at 97:14-98:9. Using Sandoval to translate, Saulo's family told Bailey that he had a history of epilepsy, had not taken his medication, was mentally ill, and that they had been unable to communicate with him since 3:00 AM. *Id.* at 98:15-99:9. Bailey did not recall any mention of violent or suicidal tendencies. *Id.* at 99:10-15. Next, Bailey asked Officer Ciarla—positioned in the alleyway—whether he could see Saulo. *Id.* at 99:17-100:21. Ciarla could not, but did tell Bailey that he saw a mirror "fluttering," "fluctuating," or "rocking back and forth," on the bed. *Id.*

These facts—known by Sergeant Bailey before he ordered the breach—created probable cause to believe Saulo was either in imminent danger or a danger to himself. *See Catlett*, 2015 WL 9272877, at *4. Plaintiffs do not adequately dispute what Bailey was aware of at the time. Instead (and in addition to an inapposite subjective argument), Plaintiffs argue that because Saulo was hiding behind the mirror, he was clearly not having a seizure or otherwise in distress. Opp. at 6. But the fact that Saulo was hiding behind a mirror, which Plaintiffs agree was shaking, *see* Opp. SoF, Responsive Facts ¶ 7, does not undermine the reasonable conclusion that he was in danger. The facts remain that Sergeant

5

Bailey was faced with an emotionally disturbed, epileptic man who locked himself in a bedroom without taking his medicine. He had broken some glass and shouted but refused to communicate with the police or his family. His actual condition was unknown, as Saulo was hidden behind a shaking mirror. Those facts objectively justify a reasonable belief that Saulo either needed aid (based on his failure to respond, breaking of glass, refusal to take medicine, history of seizures, and the shaking mirror) or was a danger to himself (by refusing to take his seizure medication and breaking glass in a disturbed state). The facts that (1) Saulo was not actually suffering from a seizure at the time and (2) had briefly left the bedroom earlier that morning do not mandate otherwise. Opp. at 6, 10. The relevant facts are what Sergeant Bailey knew. Faced with that set of facts, a reasonable officer would conclude Saulo likely needed immediate aid or was a danger to himself. *See Meyer*, 482 F.3d at 1240; *Monday*, 118 F.3d at 1102. Plaintiffs position that Sergeant Bailey should have waited for a crisis negotiator, "poll cam," or robot is also inapposite. Opp. at 2. Saulo was not responding and a reasonable officer would believe he needed immediate help or was a present danger to himself. Accordingly, quick action was reasonable and summary judgment is **GRANTED** for Sergeant Bailey on Plaintiffs' 1983 claims.

### 3. *Excessive and Unnecessary Force*

Plaintiffs also assert liability based on Officer Kush's use of deadly force. Use of deadly force is a "seizure" under the Fourth Amendment and subject to the same objective "reasonableness" requirement discussed above. In making reasonableness determinations, courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (citation omitted). "It is unreasonable for an officer to use deadly force against a suspect unless the officer has good reason 'to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

Here, too many genuine issues of material fact remain for the Court to determine whether Officer Kush's use of force was reasonable as a matter of law (e.g., the presence or position of a hammer in Saulo's hand, the dimensions and layout of the bedroom and hallway, the time and ability to take alternative action, etc.). Because the Court cannot rule on the reasonableness of the force applied, it cannot hold that Officer Kush is entitled to qualified immunity at this stage. *See Giles*, 571 F.3d at 326 (finding issues of fact may preclude ruling on qualified immunity question at summary judgment). Accordingly, summary judgment is **DENIED** as to the Section 1983 claims against Officer Kush.

### 4. *Municipal Liability for Entry and Failure to Train*

Plaintiffs assert liability against the Municipal Defendants as well. "It is well-settled that, if there is no [constitutional or federal rights] violation in the first place, there can be no derivative municipal claim." *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Here, exigent circumstances justified the warrantless entry. *Supra* Part IV.A.2. Accordingly, there can be no derivative claim against the Municipal Defendants for the entry.

6

As to the use of force, municipalities may be held liable under Section 1983 "when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) (citing *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658 (1978)). A "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The failure to train "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. Only then can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (cleaned up). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." Without notice through a pattern of violations, municipal "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* "In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered." *Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007).

Plaintiffs *Monell* claims are based on the alleged (1) inadequacy of Paterson's Internal Affairs ("IA") investigation of complaints against officers and (2) failure to adequately train on how to handle emotional disturbed persons and barricaded suspects." Opp at 14. As to the latter theory, Plaintiffs fail to point to any evidence of a pattern of similar constitutional violations against EDPs or barricaded subjects. *See* Opp. 13-18. Although it is possible to maintain a claim of failure to train without demonstrating such a "pattern . . . the burden on the plaintiff in such a case is high. . . . [I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (citations omitted). "The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected deliberate indifference." *Id.*

Here, Plaintiff failed to meet its burden of evidencing the alleged violations of federal rights were "*highly predictable* consequences of . . . *recurring situations*." *Id.* (emphasis added); Opp. at 13-18 (failing to mention recurring situations or address likelihood of rights violations). Therefore, summary judgment is **GRANTED** on the failure-to-train *Monell* claim.

### 5. *Municipal Liability Based on Internal Affairs Investigations*

As to the IA investigations, Plaintiffs submit an expert report from Dr. Wayne Fisher concluding: (1) the investigation into the present incident was insufficient, (2) only four of fifty other IA investigations reviewed by Dr. Fisher were sustained, and (3) Paterson's IA's investigatory process in other excessive force cases was deficient. Opp. at 15-16. Dr. Fisher concludes the failure to "provide for . . . accountability . . . created an atmosphere

7

where violation of citizens' civil rights were implicitly condoned or at best overlooked." *Id.* In other words, there was a custom of violations or a deliberate indifference to them.

Though stemming from failure-to-train cases, "courts have adopted the 'deliberate indifference' standard in other policy and custom contexts." *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996). Plaintiffs must establish "that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations." *Id.* Claims survive summary judgment when the Court has (1) statistical evidence of inadequate IA investigations and (2) a history of complaints against the defendant officer. *Id.* at 973; *see also Colon v. City of Paterson*, No. 12-cv-1653 WJM, 2014 WL 4441503, at *7 (D.N.J. Sept. 9, 2014). When individualized evidence is unavailable, courts have deemed-sufficient "a sample of forty excessive force complaints . . . bearing similarities to [the present] case and arguably evincing a tendency on the part of the [IA] division to insulate officers from liability." *Katzenmoyer v. Camden Police Dep't*, 08-cv-1995, 2012 WL 6691746, at *5 (D.N.J. Dec. 21, 2012) (discussing *Merman v. City of Camden*, 824 F.Supp. 2d 581, 593–94 (D.N.J.2010)). Courts also accept an increasing number of complaints over a short period. *Williams v. Ponik*, 15-cv-1050, 2019 WL 168827, at *11 (D.N.J. Jan. 11, 2019).

Here, Plaintiffs fail to submit evidence of *similar* deficient excessive force investigations, increasing numbers of complaints, or a history of complaints against Officer Kush. Dr. Fisher did analyze fifty IA investigations, and found them lacking in several respects. However, neither Dr. Fisher nor Plaintiffs explain how the sample cases were selected and how the conduct at issue was *similar* to the present matter. *Cf. Katzenmoyer*, 2012 WL 6691746 at *5 (accepting "a sample of forty excessive force complaints . . . bearing similarities to [the present] case"). Indeed, in the few cases Dr. Fisher does describe, there was no EDP, barricaded individual, loss of life, or service weapon used. *See* Fisher Rep. at 20-32, ECF No. 129-15. Further, Plaintiffs do not address how investigations by the Paterson Prosecutors Office in deadly force cases squares with their theory that lax IA investigations created a culture of impunity. *See id.* at 9 (explaining prosecutors' involvement in deadly force cases). Plaintiffs' statistical evidence is similarly lacking. Dr. Fisher opines that four of the fifty excessive force complaints he reviewed were sustained. *Id.* at 20. However, Dr. Fisher provides no baseline to judge against. And a 4/50 sustained rate (8%) is significantly greater than the rate in cases where summary judgment was denied. *See Merman*, 824 F.Supp. 2d at 590-91 (2/470 sustained, or 0.42%); *Colon*, 2014 WL 4441503, at *7 (5/610 sustained, or 0.82%). Accordingly, Plaintiffs failed to meet their threshold burden of evidencing *similar* unlawful conduct and subsequent failure to take precautions (i.e., a relevant municipal custom). *See Beck*, 89 F.3d at 972. Further, without any connection between the lax IA procedures and previous exonerations of Officer Kush himself (or at least examples of exonerations in other deadly-force, EDP, or barricade cases), Plaintiffs failed to plausibly connect the injuries suffered to a municipal practice or custom. Accordingly, summary judgment is **GRANTED** on Plaintiff's 42 U.S.C. § 1983 claims (Counts One, Two, and Five) against the Municipal Defendants.

### B. State Law Claims (Counts Four, Six-Twelve)

Plaintiffs also bring state-law claims based on the same conduct discussed above.

#### 1. *Good-Faith Immunity for all State Claims*

Defendants argue that, for the same reasons discussed above, they are entitled to "good faith immunity" and summary judgment should be entered on the state law claims.

##### a. Protection for Entry into Residence and Bedroom

Under the New Jersey TCA's "good faith immunity" provision, "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J.S. § 59:3-3. To qualify, "[a] public employee either must demonstrate objective reasonableness or that he behaved with subjective good faith. . . . Immunity attaches if the employee can show either objective or subjective good faith." *Alston v. City of Camden*, 168 N.J. 170, 186, 773 A.2d 693, 703 (2001) (cleaned up). "The same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the [TCA]." *Wildoner v. Borough of Ramsey*, 162 N.J. 375, 387 (2000).

Here, the Court already determined that Sergeant Bailey's conduct was objectively reasonable under the circumstances. *See supra* Part IV.A.2-3. Thus, good faith immunity applies. *See Wildoner*, 162 N.J. at 387 (finding reasonableness standard equivalent to Section 1983 context). Accordingly, summary judgment is **GRANTED** on Plaintiffs' state-law claims (Counts Four, Six-Twelve) against Bailey. As to the Municipal Defendants, a "public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." N.J.S. § 59:2-2. Therefore, summary judgment is also **GRANTED** for the Municipal Defendants on the state law claims based on Sergeant Bailey's conduct.

##### b. Protection for Conduct Inside Bedroom

As to Officer Kush, as discussed above, too many genuine issues of material fact remain to determine whether his conduct was objectively reasonable. *See supra* Part IV.A.3. While subjective good faith can also confer protection, Defendants fail to sufficiently present a subjective argument. *See* Paterson Mot. at 32-33. As Defendants will bear the burden of demonstrating good faith at trial, their contention that "Plaintiff has presented no evidence to refute that Kush was acting in good faith" is insufficient. Reply at 24; *see also Donovan*, 661 F.3d at 185; *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 582, 969 A.2d 1097, 1112 (2009) (burden on defendants to show immunity applicable). Immunity pursuant to N.J.S. § 30:4-27.7(a) is inapplicable, at this stage, for the same reasons. *See* N.J.S. § 30:4-27.7(a) (requiring action "in good faith"). Accordingly, summary judgment is **DENIED** as to Officer Kush's good-faith immunity.

#### 2. *TCA Notice for State Claims by the Estate*

The Municipal Defendants argue the Estate's negligence (Count Four), wrongful death (Count Six), survival (Count Seven), tortious conduct (Count Ten), negligent hiring (Count Eleven), and negligent supervision (Count Twelve) claims against them should be dismissed for failure to file a timely TCA Notice. Paterson Mot. at 29-31. Plaintiffs

respond that Carmen Gonzalez and Yunior Reyes filed TCA notices in their capacity as administrators of the Estate, not individual plaintiffs. Opp. at 20. Alternatively, Plaintiffs argue, the doctrine of "substantial compliance" forgives Plaintiffs failure and Defendants are estopped from invoking a TCA notice defense so late in this litigation. Opp. at 21-22.

As an initial matter, Carmen Gonzalez and Yunior Reyes filed TCA notices listing themselves as the "claimant," did not mention claims by any "estate," and advanced individual claims in this lawsuit (which are now dismissed). *See* Murphy Ex. 41 at 20; Amend. Compl., Caption; Nov. 3, 2016 Order, ECF No. 78. Accordingly, the Estate failed to fully comply with the TCA. *See* N.J. Stat. § 59:8 (setting forth notice requirements). Plaintiff's estoppel argument is also easily discarded, as Defendants raised the notice issue in their Answer. ECF No. 41 at 13.

As to substantial compliance, courts invoke the doctrine "to prevent barring legitimate claims due to technical defects." *Lebron v. Sanchez*, 407 N.J. Super. 204, 215 (App. Div. 2009) (citations omitted). Perfect compliance with the notice requirements is unnecessary. *Id.* "Substantial compliance means that the notice has been given in a way, which though technically defective, substantially satisfies the purposes for which notices of claims are required. *Id.* (cleaned up). The party invoking the doctrine must show (1) lack of prejudice to the defendant; (2) a series of steps taken to comply with the statute; (3) a general compliance with the purpose of the statue; (4) a reasonable notice of the claim; and (5) a reasonable explanation why there was not strict compliance with the statute. *Id.*

Here, despite citing *Lebron*, Plaintiffs only address the lack of prejudice. Opp. at 21. While Defendants did not raise this issue until their Reply, as the party invoking the doctrine, Plaintiffs should have addressed each element in their brief. However, the Court is cognizant of the policy underlying TCA notice decisions not to bar legitimate claims due to technical defects. *Id.* Accordingly, Plaintiffs will be **ORDERED TO SHOW CAUSE** how the TCA notices satisfy all five elements of substantial compliance. *See id.* In doing so, counsel is cautioned not to misrepresent the notices' content. *Compare* Opp. at 20-21 (stating neither Carmen nor Yunior filed individual claims and since they were not present at the scene, the TCA Notices were "very clear" that Yunior and Carmen were administrators), *with* Murphy Ex. 41 at 20-21, 13-14 (listing Yunior and Carmen as "Claimant," stating "Claimant [was] present," and not including the word "administrator"). The parties should also address whether this defense applies to the Individual Defendants.

### 3. *Negligence Claim (Count Four)*

Cross referencing other parts of their brief, Defendants argue there is no genuine issue of material fact as to any negligence by the Defendants. Paterson Mot. at 37. The Court agrees with respect to Sergeant Bailey. *See supra* Part IV.A.2. But as discussed above, too many issues of material fact remain to reach that conclusion with respect to Officer Kush's conduct. *See supra* Part IV.A.3. For this alternative reason, summary judgment is **GRANTED** on Plaintiff's negligence claims stemming from Sergeant Bailey's conduct and **DENIED** with respect to Officer Kush's conduct.

### *4. Emotional Distress Claim Threshold (Counts Eight-Nine)*

Defendants argue that the Individual Plaintiffs' negligent infliction of emotional distress ("NIED") claims (Count Nine) "must be dismissed because Plaintiffs are unable to satisfy the suit threshold requirements of the [TCA]." Paterson Mot. at 19. Pursuant to the TCA, public entities and employees are immune from damages "for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages . . . shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." N.J.S. § 59:9-2(d). Emotional distress is considered "pain and suffering" under the TCA. *Ayers v. Jackson Twp.*, 106 N.J. 557, 577 (1987).

Defendants argue there is no evidence of permanent injury, aggravating circumstances, or medical expenses exceeding $3,600.00, and thus damages for NIED are prohibited under the statute. Plaintiffs fail to respond to those arguments. *See generally* Opp. Therefore, summary judgment is **GRANTED** on the Individual Plaintiffs' NIED claims (Count Nine). *See E.g.*, *Sportscare of Am., P.C. v. Multiplan, Inc.*, 10-cv-4414, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011) ("failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver"). While Defendants only assert their claim-threshold argument with respect to the Individual Plaintiffs' NIED claims, Paterson Mot. at 19-21, the Court sees no reason why the Individual Plaintiffs' other tort theories—especially the intentional infliction of emotional distress claims (Count Eight)—are not subject to the same defense. Accordingly, Plaintiffs will be **ORDERED TO SHOW CAUSE** why summary judgment should not be granted on the remaining state law claims pursuant to N.J.S. § 59:9-2(d).

### *5. Negligent Hiring and Training (Count Eleven) and Negligent Supervision (Count Twelve)*

Defendants argue the Estate's claims for negligent hiring and training (Count Eleven) and Negligent Supervision (Count Twelve) are legally deficient, as there is no record evidence to demonstrate either Officer Kush or Sergeant Bailey were unfit, nor that any unfitness caused the injury here. Paterson Mot. at 38. Plaintiffs fail to respond or otherwise defend the claims. *See generally* Opp. Br. Accordingly, and for the reasons set forth in Defendants brief, summary judgment is **GRANTED** on the Estate's negligent hiring, training, and supervision claims (Counts Eleven and Twelve). As the same legal reasoning applies to negligent hiring, training, and supervision claims asserted by the Individual Plaintiffs, summary judgment is **GRANTED** on those claims too.

### C. <u>Remaining Issues Related to Municipal Defendants</u>

Defendants argue that as an administrative arm of the City of Paterson, the Paterson Police Department is not a proper Defendant. Paterson Mot. at 39. Defendants also argue the Municipal Defendants cannot be liable for punitive damages. *Id.* at 19. Plaintiffs do not object and Defendants are correct on both counts. *See* Opp. at 18; *Padilla v. Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004). Accordingly, summary judgment is **GRANTED** in favor of the Paterson Police Department and in favor of the City on the issue of punitive damages.

11

### D. Remaining Claims and Order to Show Cause

Given the complex web of overlapping claims, the Court will summarize its understanding of which claims remain and what issues Plaintiffs should address:

- **Counts 1, 2, 5**: Section 1983 claims by the Estate, Javier, Leidy, and Honey against the Individual Defendants besides Sergeant Bailey.
- **Count 4**: Negligence claims against all Defendants besides Bailey.
- **Count 6**: Wrongful death by the Estate against all Defendants besides Bailey.
- **Count 7**: Survivorship by the Estate against the all Defendants besides Bailey.
- **Count 8**: Intentional infliction of emotional distress by the Individual Plaintiffs against the Individual Defendants besides Bailey.
- **Count 10**: Tortious conduct of an employee against the City of Paterson.

Plaintiffs will be **ORDERED TO SHOW** cause why summary judgment should not be entered in favor of Defendants on (1) the Estate's state-law claims for failure to substantially comply with the TCA's notice requirements, *supra* Part IV.B.2 and (2) the Individual Plaintiffs' state-law claims for failure to meet the TCA's claim threshold, *supra* Part IV.B.4. *See* FRCP 56(f)(1)-(2) (permitting court to grant summary judgment on grounds not raised by a party after giving notice and reasonable time to respond).

### V. CONCLUSION

For the reasons set forth above, Defendants Kush, Bailey, the City of Paterson, and its Police Department's motions for summary judgment, ECF Nos. 127-28, 130, are **GRANTED IN PART** and **DENIED IN PART**. An appropriate order follows.

*/s/ William J. Martini*

**Date: January 23rd, 2020**  **WILLIAM J. MARTINI, U.S.D.J.**